**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JONATHAN BLADES and ANTWAN BUCHANAN, *et al*., | |
| Plaintiffs-Petitioners, | |
| v. | No. |
| BUREAU OF PRISONS, *et al*., | |
| Defendants-Respondents. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

The Bureau of Prisons ("BOP") assigns each of the residents in its custody a "criminal history score" — a score that plays a large part in determining security classification and eligibility for release to home confinement. The BOP has established two different schemes to calculate residents' criminal history points, which are then converted into the criminal history score. The first system, which applies to over 95 percent of BOP residents, relies on the nuanced and empirically validated United States Sentencing Guidelines' ("Sentencing Guidelines") criminal history points calculation that includes limitations on the consideration of old, minor, and juvenile offenses. *See* U.S. DEP'T OF JUSTICE, FED. BUREAU OF PRISONS, PROGRAM STATEMENT 5100.08: INMATE SECURITY DESIGNATION & CUSTODY CLASSIFICATION ("PS 5100.08") 33 (2006), https://www.bop.gov/policy/progstat/5100_008.pdf. The second system, which applies to the remaining roughly five percent of residents, is a crude approximation of the Sentencing Guidelines that jettisons all of the nuances and limitations of that scheme. *See id.* at 33–34. In the majority of cases, the second system produces higher criminal history scores for the minority of residents subject to it, resulting in their disproportionate detention in dangerous high security prisons.

1

The only difference between people subject to the first and second systems is the court that sentenced the person to a term of incarceration. People subject to the first system were sentenced by one of the 94 federal district courts and comprise the vast majority of people incarcerated in the BOP. People subject to the second system were sentenced by the Superior Court of the District of Columbia, other state courts, or military tribunals. *See id.* at 33. Plaintiffs and the proposed class who were all sentenced by D.C. Superior Court and who are serving their sentences in BOP custody are subject to the second system — the harsher criminal history points scoring scheme that systematically results in worse criminal history and security scores.

Plaintiffs filed suit to challenge their discriminatory treatment based on the court from where they were sentenced, raising claims under the Administrative Procedure Act ("APA") and the Fifth Amendment's Equal Protection Clause. Because of the BOP's unconstitutional and unlawful criminal history scoring rule, Plaintiffs are disproportionately incarcerated in higher security facilities where they are subject to increased violence, less rehabilitative programming, lower wages for prison jobs, and cannot be considered for release to home confinement.

Plaintiffs' concerns are not abstract or anecdotal. Empirical evidence confirms their disproportionate and unequal treatment. While 12 percent of BOP residents overall are incarcerated in high security prisons, 39 percent of individuals with D.C. sentences are housed in those institutions. *See* COUNCIL FOR COURT EXCELLENCE, ANALYSIS OF BOP DATA SNAPSHOT FROM JULY 4, 2020 FOR THE DISTRICT TASK FORCE ON JAILS AND JUSTICE 4 (2020), http://www.courtexcellence.org/uploads/publications/Analysis_of_BOP_Data_Snapshot_from_7 420.pdf. In other words, Plaintiffs and proposed class members are <u>over three times as likely</u> to be incarcerated in a high security penitentiary than other BOP residents. And although high security facilities house only 12 percent of BOP residents, they account for 54 percent of the most

serious violent incidents in the BOP, including assaults, sexual abuse, and deaths.  *See* Exhibit B, Declaration of Nathan Winshall ("Winshall Decl.") ¶ 7.[1]

This Court should enjoin the BOP from applying its discriminatory and unjustified criminal history scoring rule to remedy this injustice.  Plaintiffs are substantially likely to succeed on the merits of their claim that the BOP's two-tiered criminal history score system is arbitrary, capricious, and unconstitutional in violation of the APA and serves no rational basis in violation of the Equal Protection Clause.  Plaintiffs are irreparably harmed by the BOP's unconstitutional and arbitrary policy, and the balance of the equities and the public interest support an injunction.

## **BACKGROUND**

The Bureau of Prisons is a federal agency that is charged with the "management and regulation of all Federal penal and correctional institutions."  Pub. L. No. 71-218, 46 Stat. 325 (May 14, 1930).  Although the BOP was originally established to incarcerate people sentenced in the federal court system, beginning in 1997, the BOP started taking custody of individuals who were sentenced by the D.C. Superior Court.  As part of its responsibilities under the D.C. Revitalization Act, the BOP is charged with designating where individuals with D.C. Code convictions will be incarcerated.  *See* D.C. Code § 24-101.  The D.C. Revitalization Act requires that individuals transferred to BOP custody "shall be subject to any law or regulation applicable to persons committed for violations of laws of the United States consistent with the sentence imposed."  *Id.* § 24-101(b).  Since then, the BOP has been responsible for the "custody, care, subsistence, education, treatment and training of such persons."  *Id.*

---

[1] The BOP's internal data shows that "since 2010, there have been 71,902 incidents at 'High' security facilities; there have been 47,066 incidents at 'Medium' security facilities; there have been 12,970 incidents at 'Low' security facilities; and there have [been] 664 incidents at 'Minimum' security level facilities."  Ex. B, Winshall Decl. ¶ 7.

The BOP is required by statute to appropriately place and house individuals (including people sentenced by D.C. Superior Court) in secure facilities.  For any individual in its custody, the BOP must "designate the place of the prisoner's imprisonment * * * subject to * * * the prisoner's security designation" and other relevant factors.  18 U.S.C. § 3621.  To implement 18 U.S.C. § 3621's requirement that the BOP "designate" an individual's facility placement based on security level, the BOP adopted (without using notice-and-comment rulemaking) Program Statement 5100.08, which creates the dual criminal history score systems challenged here.

**A. The Bureau of Prisons' criminal history scoring rule deviates from the Sentencing Guidelines' criminal history calculations.**

People are committed to the custody of the BOP through different means; the vast majority are "sentenced federal inmates" who were convicted in one of the 94 federal district courts.  U.S. DEP'T OF JUSTICE, FED. BUREAU OF PRISONS, LEGAL RESOURCE GUIDE TO THE FEDERAL BUREAU OF PRISONS 1 (2019).  When individuals are sentenced in a federal court, trained federal probation officers are required to tally an individual's criminal history points pursuant to Chapter 4 of the Sentencing Guidelines.  That calculation is vetted and reviewed by attorneys and the federal district court judge (who must independently calculate the Sentencing Guidelines) prior to sentencing.  It is transmitted to the BOP either through the final judgment, the Statement of Reasons, or the Presentence Report, and it is automatically converted into a criminal history score and inputted into the BOP's security classification system.  *See* PS 5100.08 at 33.[2]

---

[2] Criminal history points are converted into a criminal history score based on a simple set of conversions:  0 or 1 criminal history points convert to a criminal history score of 0, 2 or 3 points convert to a score of 2, 4 to 6 points convert to a score of 4, 7 to 9 points convert to a score of 6, 10 to 12 points convert to a score of 8, and 13 or more points convert to a score of 10.  P5100.08 at 33.

A small minority of BOP residents, including Plaintiffs and the proposed class, enter without criminal history points already calculated under the Sentencing Guidelines.  Those cases include "when the PSR is waived, on offenses committed prior to November 1, 1987, state cases, and military and D.C. Code offenders." [3]  PS 5100.08 at 33.  For that minority of residents, the BOP's Program Statement 5100.08 establishes an alternative criminal history points calculation that bears some resemblance to the Sentencing Guidelines, but is significantly different in the ways described below.

The Sentencing Guidelines' criminal history points calculation is a nuanced and validated system that is a "[r]ecidivism [p]redictor."  Exhibit A, Report of Professor Brent Newton ("Newton Rep.") at 5.  It was based on the United States Parole Commission's Salient Factor Score, an "empirically-based, validated risk-assessment instrument used to make parole decisions."  *Id.*  The Sentencing Guidelines' Criminal History section sets out general principles for counting prior convictions, *see* United States Sentencing Commission, *Guidelines Manual*, §4A1.1 (Nov. 2021), as well as a wide array of definitions, commentary, and examples to ensure that it is applied uniformly.  Importantly, Chapter 4 sets out a range of exceptions to the counting of certain prior convictions.  *See* USSG § 4A1.2.  For instance, the Sentencing Guidelines awards three criminal history points for a prior sentence of imprisonment exceeding one year and one month, *see* USSG § 4A1.1(a), but only where that sentence was imposed "within <u>fifteen years</u> of the defendant's

---

[3] Pursuant to the Revitalization Act, nearly all individuals sentenced to felonies by the D.C. Superior Court are immediately transferred to BOP custody to serve out their sentences.  For that reason, individuals with D.C. Code convictions comprise the bulk of individuals affected by the BOP's rudimentary and arbitrary scoring scheme.  Because this lawsuit focuses on the unfair treatment of individuals with D.C. Code convictions sentenced by the D.C. Superior Court, only that group will be referenced throughout the motion.  It is worth noting, however, that the criminal history scoring of individuals serving other state or military tribunal sentences is equally unfair and arbitrary for the same reasons.

commencement of the instant offense," *id.* §4A1.2(e)(1) (emphasis added).[4]   Thus, a two-year

sentence imposed in 2002 would not result in any criminal history points for a defendant sentenced

today.   As Professor Brent Newton explains, the Sentencing Guidelines' criminal history points

calculation "exclude[s] 'stale' prior convictions * * * from consideration in calculating an

offender's criminal history score."  Ex. A, Newton Rep. 5.

      In contrast, the BOP's criminal history points calculation reflects none of the "empirically-

based" nuances of the Sentencing Guidelines' criminal history points calculation.  In essence, the

BOP's criminal history scoring rule copies the general principles for counting prior convictions

from the Sentencing Guidelines, but omits all of its definitions and exceptions.  As Professor

Newton describes, the BOP's criminal history scoring rule considers a wide range of convictions

— including those "stale" convictions described above — that are not counted under the

Sentencing Guidelines.  Professor Newton identifies eight areas where the BOP's criminal history

scoring rule awards criminal history points for convictions that would not be counted under the

Sentencing Guidelines, including in the consideration of stale convictions, misdemeanors, and

juvenile offenses, and in separately awarding points for charges in the same charging instrument.

*See* Ex. A, Newton Rep. 7–8.

### B.   The named Plaintiffs' criminal history points and scores are higher under the BOP's system than they would be under the Sentencing Guidelines.

      Professor Newton explains how, in almost every instance, the BOP's criminal history

scoring rule produces more criminal history points — and higher criminal history scores — than

---

[4] The Sentencing Guidelines would also count any prior sentence exceeding one year and one month if it "resulted in the defendant being incarcerated during any part of such fifteen-year period."  USSG § 4A1.1(a).

the Sentencing Guidelines' criminal history points calculation.  Ex. A, Newton Rep. 10.  The two named Plaintiffs' own calculations illustrate how this operates in practice.

Plaintiff Antwan Buchanan was sentenced out of D.C. Superior Court, subjecting him to the BOP's criminal history scoring rule, which yielded 20 criminal history points.  Nearly half of those 20 points would not have been counted under the Sentencing Guidelines' criminal history points system.  For instance, Mr. Buchanan received a 90-day suspended sentence in 2004 for operating a vehicle on a suspended permit.  The BOP counted that conviction under its criminal history scoring rule, but would not have under the Sentencing Guidelines because that conviction is stale and falls outside the Sentencing Guidelines 10-year look-back period for shorter sentences, *see* USSG § 4A1.2(e)(2).  Mr. Buchanan also was convicted of two counts of possession of a controlled substance for an offense that occurred on the same day.  Under the Sentencing Guidelines' criminal history points calculation, only one of those counts would receive points because the Sentencing Guidelines treat as a "single sentence" prior sentences that "were imposed on the same day or resulted from offenses charged in the same charging instrument."  Ex. A, Newton Rep. 3; *see* USSG § 4A1.2(a)(2).  Under the BOP's criminal history scoring rule, Mr. Buchanan received criminal history points for both charges.

Consider also Plaintiff Jonathan Blades.  When Mr. Blades was a juvenile, he was charged with carrying a dangerous weapon and sentenced to six months of probation.  Under the Sentencing Guidelines' criminal history points calculation, that juvenile offense is not awarded any criminal history points.  *See* Ex. A, Newton Rep. 4.  However, under the BOP's criminal history scoring rule, this juvenile offense is included in the calculation of Mr. Blades' criminal history points.  In short, both Mr. Buchanan and Mr. Blades — and many of the thousands of proposed class members who were sentenced by D.C. Superior Court — have more criminal history points and higher

criminal history scores under the BOP's system than they would if their criminal history points were calculated under the Sentencing Guidelines like their federal counterparts.

**C. Criminal history scores have wide ranging effects, including affecting an individual's facility placement.**

Broadly speaking, a person committed to the custody of the BOP is housed in one of four types of facilities, sorted by security level. In order from least restrictive to most restrictive, those facilities are Minimum, Low, Medium, and High. *See* PS 5100.08 at 7–8. To sort BOP residents into one of those four security classifications, the BOP relies on a weighted scoring system that adds up a number of inputs — including severity of offense, existence of a detainer, criminal history score, history of violence, history of escape, age, education level, and history of substance abuse — to generate a total security point score. *Id.* at 41. The criminal history score input has the highest possible point value and thus contributes significantly to the overall security score. To illustrate, the highest criminal history score is 10 whereas an individual could only get a maximum of seven security points for committing serious violence within the last five years. *Id.*

Typically, male residents with a security point score between zero and 11 points are placed in a "Minimum" facility, with 12 to 15 points in a "Low" facility, with 16 to 23 points in a "Medium" facility, and with 24 or above points in a "High" facility. *Id.* at 8. For an incarcerated individual, there are significant differences between facilities of different security classifications. Incidents of violence and sexual assault are greatly concentrated in high security facilities. *See* Ex. B, Winshall Decl. ¶ 7. Higher security facilities also offer fewer programming and vocational opportunities, pay lower wages for prison jobs, impose greater restrictions on liberty by requiring

residents to spend more time in their cell each day,[5] and have fewer resources available for residents to practice their religion.

The BOP also relies on criminal history points for its recently implemented recidivism risk tool, the "Prisoner Assessment Tool Targeting Estimated Risk and Need," or "PATTERN" score. As required by the First Step Act, 18 U.S.C. § 3631(b)(4), the Department of Justice developed PATTERN so that the BOP could better "assess the individual risk that an inmate will recidivate (return to prison) and to identify the programs which will address the needs of an inmate to reduce his or her recidivism risk." BUREAU OF PRISONS, *First Step Act: BOP Issues RFI* (Dec. 30, 2019), https://www.bop.gov/resources/news/20191230_rfi.jsp.   Under PATTERN, individuals are calculated to be high, medium, low, or minimum, with higher PATTERN scores correlating with higher risks of recidivism.  The "predictive" and "validated" formula for generating a PATTERN score places the single greatest weight on criminal history points as determining someone's risk of recidivism.  OFFICE OF JUSTICE PROGRAMS, 2020 REVIEW AND REVALIDATION OF THE FIRST STEP ACT RISK ASSESSMENT TOOL 2 (2021), https://www.ojp.gov/pdffiles1/nij/256084.pdf.  To illustrate, an individual can earn up to 40 points under the PATTERN assessment for having 13 or more criminal history points.  *See id.* at 14.  By contrast, a history of escaping within the past five years can earn someone a maximum of six points and a history of recent serious violence within an institution can earn someone a maximum of seven points.  *Id.* at 15.  The PATTERN score has several effects on BOP residents:  Most importantly, the BOP uses it to determine eligibility for early release.  For example, during a global pandemic that ravaged the incarcerated population, only individuals that maintained a low or minimum PATTERN score for at least two assessment

---

[5] In addition, high security facilities are more frequently on lockdown status due to institutional violence and security issues.  Such lockdowns require residents to be in their cells for 23 hours a day without opportunity for programming, work, or social visits.

cycles could be released to home confinement.  *See* Memorandum from Andre Matevousian, Ass't Dir., Corr. Programs Div., Bureau of Prisons, to Chief Exec. Officers (April 13, 2021) (defining as "suitable for home confinement" BOP residents who are "Low or Minimum security" and "Low or Minimum PATTERN recidivism risk score[s]").

In addition, Courts often rely on the BOP's PATTERN recidivism assessment in determining whether individuals are non-dangerous and can be released under compassionate release statutes.  *See, e.g.*, *Samuel Moore v. United States*, No. 21-CO-463, Order at 2 (D.C. Aug. 16, 2021) (finding the BOP's classification of appellant as "a low recidivism risk" to be evidence of non-dangerousness); *Dewayne Richardson v. United States*, No. 21-CO-53, Order at 1 (D.C. March 4, 2021) (finding the "BOP's own determination" that appellant was a "minimum risk of recidivism" to be evidence of non-dangerousness).

## **ARGUMENT**

When ruling on a motion for preliminary injunction, the Court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest."  *Sottera, Inc. v. Food & Drug Admin.*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks omitted) (quoting *Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009)). Where, as here, "the Government is the opposing party," the determination of the third and fourth factors regarding "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**A. Plaintiffs are substantially likely to succeed on the merits of their claims.**

The Bureau of Prisons has created an arbitrary criminal history scoring scheme for the roughly two to four percent of individuals with D.C. Code convictions in its custody.[6]  This scoring system results in inflated criminal history scores that are not based in any reason related to safety or security, and that put individuals at a significant disadvantage to their federal counterparts when it comes to facility placements, programming opportunities, and release to home confinement.  The BOP's unequal, unfair, and unjustifiable criminal history scoring of individuals convicted of D.C. Code offenses violates the Administrative Procedure Act's requirement that agency action be considered and reasonable, and it violates the Fifth Amendment's fundamental guarantee that similarly situated individuals be treated equally under the law.

**1. Plaintiffs are substantially likely to succeed on the merits of their APA claims.**

> *a. The Bureau of Prisons violated the Administrative Procedure Act by creating a rule that arbitrarily, capriciously, and unjustifiably treats individuals convicted of D.C. Code convictions worse than their federal counterparts.*

The Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, [] otherwise not in accordance with law."  5 U.S.C. § 706(2).  BOP Program Statement 5100.08[7] is all of the above:  It is a final agency rule that is arbitrary, capricious, and unconstitutional and must be set aside for violating the APA's substantive requirements.

---

[6] The total population of individuals in BOP custody is currently 134,604.  *See* BUREAU OF PRISONS, *Statistics*, https://www.bop.gov/about/statistics/population_statistics.jsp (last accessed Feb. 3, 2022).  The total number of individuals with D.C. Code convictions that were in BOP custody has fluctuated in recent years from around 3,300 to around 4,600 people.  *See* COUNCIL FOR COURT EXCELLENCE, BOP DATA SNAPSHOT 1.

[7] For ease of reference, Program Statement 5100.08 is referred to in its entirety, but the Plaintiffs are challenging only the guidelines for scoring criminal history points for individuals with D.C. Code convictions ("criminal history scoring rule").  *See* PS 5100.08 at 33–34 (section entitled Criminal History Score).

> i. *Program Statement 5100.08's criminal history scoring rule is arbitrary, capricious, and unlawful because it sharply diverges from the "empirically-based" and "validated" U.S. Sentencing Guidelines scoring scheme for no reason and because it produces racial disparities.*

In reviewing an agency's action, the court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C. Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court's review is limited to the administrative record: the materials "before the agency at the time the decision was made," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (quoting *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981)). When, as here, the agency's actions are "conclusory or unsupported," they must be set aside as violating the APA, *United Tech. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

Relevant here, agency action is also "arbitrary and capricious if 'the agency offers insufficient reasons for <u>treating similar situations differently</u>.'" *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (emphasis added) (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999)). The BOP has violated the APA because it cannot identify any "rational basis in the evidence" for treating individuals with D.C. Code convictions[8] more harshly than their federal counterparts by applying a scoring rule that systemically results in higher criminal history scores. *Ethyl Corp. v. Env't Prot. Agency*, 541 F.2d 1, 43 (D.C. Cir. 1976).

---

[8] "Individuals with D.C. Code convictions" is used as a shorthand to refer to the group of individuals that were sentenced by D.C. Superior Court and transferred to the custody of the BOP and are subject to the BOP's scoring rule.

To understand how the BOP has treated individuals with D.C. Code convictions arbitrarily and capriciously, it is helpful to examine the substantial history and data that shaped the U.S. Sentencing Guidelines.  For individuals with federal convictions, the BOP uses the criminal history score that "is derived from the US Sentencing Guidelines Criminal History Points."  PS 5100.08 at 33.  As described above, the Sentencing Guidelines established a criminal history scoring system in 1987 and modeled it after the United States' Parole Commission's salient factor score, an "empirically-based" and "validated risk-assessment instrument."  Ex. A, Newton Rep. 5.  Chapter 4's criminal history scoring guidelines were carefully crafted to be "strong predictors of recidivism."  Ex. A, Newton Rep. 6 (quoting U.S. Sent. Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 14 (Mar. 2017)).  The guidelines were vetted by statisticians and policy makers whose primary purpose was to create a fair criminal history scoring system that was correlated with recidivism.  In keeping with that aim, the guidelines are extensively studied and routinely refined.  Decades of data and considered policy choices support the Sentencing Commission's decision to exclude certain convictions and prior sentences from warranting criminal history points and to standardize how the guidelines are applied.

Without explanation or justification, the BOP abruptly departed from the U.S. Sentencing Commission's carefully crafted and empirically supported scoring guidelines when it created a separate set of guidelines for individuals with D.C. Code convictions, other state convictions, or military convictions.  *See* PS 5100.08 at 33; Ex. A, Newton Rep. Sec. IV.  Program Statement 5100.08's criminal history scoring rule incorporates the first four provisions of the Sentencing Guidelines, but discards <u>all</u> of the remaining provisions and the exceptions tailor-made by the Sentencing Commission:  Namely, when a conviction is "stale" because the sentence was completed over 10 or 15 years ago, when it is a juvenile conviction, when multiple offenses were

sentenced together, or when the conviction is for certain types of misdemeanors, including hitchhiking, public intoxication, vagrancy, and prostitution, *see* USSG § 4A1.2(c)–(e).  Put simply, the BOP counts convictions and sentences that the U.S. Sentencing Commission decided should not have a bearing on an individual's criminal history points based on its research and data collection.

The BOP also lifted the Sentencing Guideline rules without any of the accompanying definitions or commentary that ensure the rules are applied uniformly.  *See Stinson v. United States*, 508 U.S. 36, 38 (1993) (holding sentencing guideline commentary is "authoritative").  For instance, the Sentencing Guidelines define "sentence of imprisonment" as the portion of the sentence "that was not suspended."  USSG § 4A1.2(b)(2).  By contrast, under Program Statement 5100.08's criminal history scoring rule for individuals with D.C. Code offenses, a "prior sentence of imprisonment" is undefined, meaning an individual would receive the maximum number of points for sentences that were mostly suspended.  *See* PS 5100.08 at 33 (showing no terms are defined); Ex. A, Newton Rep. 8.

An individual that previously served 30 days of a three-month sentence, for example, would receive <u>one</u> criminal history point under the Sentencing Guidelines and <u>two</u> criminal history points under the BOP's criminal history scoring rule.  That difference in points would have a measurable effect on an individual's criminal history score.  Consider an individual that only had the aforementioned prior conviction:  Under the BOP's criminal history scoring rule, he would have a criminal history score of <u>two</u>, whereas he would have a criminal history score of <u>zero</u> based on the Sentencing Guidelines' approach — two points can easily be the difference between a High and Medium security classification or a Medium and Low security classification.  The BOP cannot justify why a portion of the Sentencing Guidelines scoring scheme should be applied to individuals

14

with D.C. Code convictions, but other contextualizing portions of the scheme should not. Nor can the BOP assert that its rudimentary system is better given that it has kept in place the Sentencing Guidelines' criminal history points system for the vast majority of people in its custody.

In sum, the BOP operates two different criminal history scoring schemes to serve the exact same purpose: evaluate individuals' criminal history scores so that they can be placed in the appropriate facility. That assessment is forward looking and its accuracy is relied on by the BOP to sort individuals — regardless of sentencing court — into the same list of BOP prisons across the country. It is the height of arbitrariness for the BOP to have two systems in place that produce different results but are used and relied on for the exact same purpose. *See County of Los Angeles*, 192 F.3d at 1023 (holding that the HHS Secretary's broad discretion "is not a license to * * * treat like cases differently").

While the BOP might attempt to downplay the disparity between the BOP's scoring scheme and the Sentencing Guidelines' scheme, the difference is significant and consequential. Georgetown Professor Brent Newton, who served as the Deputy Staff Director of the U.S. Sentencing Commission for 10 years, concluded "with a high level of confidence that application of the [BOP]'s program statement's criminal history calculus generally will result in a higher criminal history score than application of [USSG] Chapter 4's rules." Ex. A, Newton Rep. at 8 (emphasis added).

The application of Program Statement 5100.08's criminal history scoring rule not only results in higher scores in individual cases, but it also affects how the class of individuals with D.C. Code convictions are treated as compared to the federal inmate population. Professor Newton notes that over half of the population of individuals with federal convictions had one or more stale convictions that were not assigned criminal history points under the Sentencing Guidelines'

scoring system.  *See* Ex. A, Newton Rep. at 9.  Indeed, "the average number of stale convictions was 3.7 and median was two."  *Id.*  (quoting U.S. Sent. Comm'n, *The Criminal History of Federal Offenders* 12 (May 2018)).  That means in the majority of cases, individuals with D.C. Code convictions could be assessed two to four more criminal history points than their federal counterparts despite having identical or substantially similar criminal history records.

On top of that, just under half of the federal offender population had at least one conviction for a misdemeanor offense "that was not assigned points under [Chapter 4 of the U.S. Sentencing Guidelines];" the average number of those convictions was 2.9.  *Id.*  These two statistics alone demonstrate that individuals with D.C. Code convictions are racking up criminal history points for age-old or petty convictions that are categorically not counted against their federal counterparts. That four-to-seven increase in criminal history points — which translates to a two-to-four-point increase in security point scores — contributes to why individuals with D.C. Code convictions are more than three times as likely to be incarcerated in high security institutions.  COUNCIL FOR COURT EXCELLENCE, BOP DATA SNAPSHOT 4 (39% of individuals with D.C. Code convictions are housed in high security prisons even though only 12% of BOP residents overall).  This arbitrary and significant difference in the criminal history score treatment of federal and D.C. populations is unexplainable by the BOP.

The fact that the BOP's criminal history scoring rule contribute to apparent race discrimination, in violation of the BOP's own policies, renders it even more arbitrary and unjustifiable.  The BOP's data shows that 38.1 percent of all of its residents are Black.  *See* BUREAU OF PRISONS, *Inmate Race*, https://www.bop.gov/about/statistics/statistics_inmate_race.jsp (last accessed Feb. 3, 2022).  By contrast, 95.6 percent of people serving a sentence in the BOP for D.C. Code convictions are Black.  COUNCIL FOR COURT EXCELLENCE, BOP DATA SNAPSHOT 2.  In other

words, the BOP's rule generates systematic and unjustifiably higher criminal history scores in an overwhelmingly Black population as compared to the majority-white federal population.

The significant racial disparity wrought by the BOP's criminal history scoring rule also violates its own regulations requiring it to refrain from discrimination on the basis of race in "the making of administrative decisions and providing access to work, housing and programs." 28 C.F.R. § 551.90. The BOP's criminal history scoring rule violates that regulation by applying an unequal and worse criminal history scoring rule — a significant contributor to housing decisions and programming opportunities — to a population with over twice the percentage of Black residents as compared to the BOP's federal population of incarcerated individuals. The BOP is aware of the disproportionate racial impact, as it publishes the very statistics that reveal the racial disparities.

Mr. Blades and Mr. Buchanan, the named Plaintiffs are both Black and present individual examples of this significant disparity. Mr. Blades' criminal history points calculation — and resulting criminal history score — is higher under the BOP's arbitrary scoring system because it counts two juvenile probationary sentences, a 2002 probationary sentence, and another 2002 fully suspended sentence, *see* Ex. F, Blades PSR Excerpt at 2–3, none of which would have resulted in criminal history points under the Sentencing Guidelines, *see* USSG § 4A1.2(d)(2), (e). Furthermore, Mr. Buchanan has a 2004 90-day suspended sentence for operating a vehicle with a suspended permit, *see* Ex. E, Buchannan PSR Excerpt at 5, that would have been excluded by the Sentencing Guidelines' calculation as stale, *see* USSG § 4A1.2(e)(2). In addition, he has prior convictions for which he received multiple points even though the offenses were contained in the same charging document and the sentences should have been treated in aggregate, *see* USSG § 4A1.2(a)(2).

Put differently, Mr. Blades and Mr. Buchanan have higher security scores solely because they were sentenced in D.C. Superior Court and not by a federal district court.  The BOP cannot provide a reason for those elevated scores that is based in its stated commitment to "safe[ty], human[ity], cost-efficien[cy], and * * * secur[ity]."  BUREAU OF PRISONS, *About Our Agency*, https://www.bop.gov/about/agency/ (last accessed Feb. 3, 2022).  Individuals are not safer if they are placed in higher security facilities that subject them to increased violence and brutality.  *See* Ex. B, Winshall Decl. ¶ 7.  The community is not more secure if individuals that do not require higher levels of supervision are placed at higher security facilities as this takes availability and staff attention away from those individuals that might require it.  Individuals are not treated more humanely if they are placed in more restrictive settings with fewer programming opportunities for no rational or individualized reason.  And in a world of limited resources and budget, it is not cost efficient to have more individuals than necessary in higher security facilities because those facilities are costlier:  they require more guards, more complex security mechanisms, and more intensive safety protocols.[9]  The BOP cannot offer any considered justifications for "treating [individuals with D.C. Code and federal convictions] differently" nor can it point to "a relevant distinction between the two [populations]" to warrant the unequal treatment.  *Muwekma Ohlone Tribe*, 708 F.3d at 216 (internal citations omitted).  Therefore, Program Statement 5100.08's criminal history scoring rule must be vacated because it is arbitrary, capricious, and unjustified.[10]

_____

[9] The BOP's scoring rule is additionally arbitrary because individuals with federal convictions are scored based on reliable documentation of their prior convictions and by trained, experienced U.S. Probation officers — "the guardians of the guidelines" — whose work is independently verified by federal judges.  Ex. A, Newton Rep. at 11 n.19.  Plaintiffs, by contrast, are scored based on their NCIC III reports, which frequently contain errors, *id.*, and by individuals who lack extensive formal training and might haphazardly apply the BOP scoring guidelines, resulting in even more arbitrary differences across the population.

[10] Program Statement 5100.08 distinctly and independently runs afoul of the APA because it violates the Fifth Amendment's guarantee that the law treat similarly situated people equally,

ii. *Program Statement 5100.08 warrants little deference because it is not the product of any formal or deliberative rulemaking process and lacks persuasive power.*

The BOP's criminal history scoring rule was not the product of a "formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001). As such, interpretations "contained in formats such as * * * internal agency guidelines" — like BOP Program Statements — "are entitled to respect, but only to the extent they have the power to persuade." *Kimberlin v. U.S. Dep't of Just.*, 150 F. Supp. 2d 36, 49 (D.D.C. 2001), *aff'd¸* 318 F.3d 228 (D.C. Cir. 2003) (citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

Here, the BOP's criminal history scoring rule has little power to persuade because it was plucked out of thin air — without the backing of a formal record or evidence to support its conclusions. The BOP's scoring scheme is by definition "conclusory" and "unsupported," *United Tech. Corp.*, 601 F.3d at 562, because it is not grounded in any type of reasoning. There is no record, for instance, explaining why certain portions of the Sentencing Guidelines were incorporated into the BOP's scheme while others were not. Nor is there any evidence that the BOP studied how its scheme would result in systematically higher scores for individuals sentenced out of D.C. Superior Court or its racially discriminatory effect. Given that the record shows the BOP "ma[de] little effort to justify" its criminal history scoring rule, it "lacks the necessary 'power to persuade'" and should be afforded little respect by this Court. *Kentucky Ret. Sys. v. E.E.O.C.*, 554 U.S. 135, 150 (2008) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

---

which is more fully examined below, *see infra* Sec. A.2. 5 U.S.C. § 706(2) (courts shall "set aside agency action * * * contrary to constitutional right.").

> ### iii.   Program Statement 5100.08's criminal history scoring rule is final agency action that can be reviewed by this Court under the APA.

> #### 1.   Program Statement 5100.08 is final agency action.

The criminal history scoring rule set forth in Program Statement 5100.08 is final agency action because it is the "consummation of the agency's decisionmaking process" and determines the "rights or obligations" of individuals in BOP custody.  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted).

As to the first prong, Program Statement 5100.08 is the agency's "last word on the matter" of criminal history score calculations for individuals with D.C. Code convictions, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (internal quotation mark omitted):  In its current state, Program Statement 5100.08 has been in effect since 2006 and the criminal history scoring rule has not been altered or modified since.  *See Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA* ("*Clean Air*"), 752 F.3d 999, 1007 (D.C. Cir. 2014) (noting that a challenged action is final if it "reflect[s] a settled agency position").  Program Statement 5100.08 was issued by then-Bureau of Prisons Director Harley G. Lappin and distributed to all facility Wardens, it has been published publicly and is available online, and incarcerated individuals are referred to this specific statement when they try to understand how their security scores are determined.

Regarding the second prong, Program Statement 5100.08's criminal history scoring rule clearly determines the rights and privileges of individuals in BOP custody.  When deciding whether guidance has a determinative effect on the regulated parties, courts consider "(1) the actual legal effect (or lack thereof) of the agency action in question on regulated entities; (2) the agency's characterization of the guidance; and (3) whether the agency has applied the guidance as if it were binding on regulated parties."  *Sierra Club*, 955 F.3d 63 (internal quotation marks omitted) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)).

Program Statement 5100.08 has clear legal effects as it dictates how an individual's criminal history score will be calculated, which impacts both their security classification score (what type of facility they will go to) and their PATTERN recidivism risk score (whether they will be considered for release to home confinement).  Both of these impact an individual's rights and privileges within the BOP.  At a high security facility, for instance, individuals are surrounded by guards and gun towers with multiple fence barriers and are subject to higher guard-to-inmate ratios, allowing for more rigorous and punitive supervision.  *See* PS 5100.08 at 7, 14.  At minimum and low security facilities, individuals live in dormitory style rooms, can move freely around the compound, and might have the opportunity to participate in work programs in the community.  *See supra* Background pp 7–10.  In addition, the BOP, which has a limited set of program offerings, assesses which individuals should access what types of rehabilitative programming opportunities based on their PATTERN scores.  The BOP has also made PATTERN scores dispositive with regards to eligibility and priority in applying for home confinement; thus, only individuals with low and minimum PATTERN scores have the right to petition for home confinement.  *See* Memorandum from Andre Matevousian, Ass't Dir., Corr. Programs Div., Bureau of Prisons, to Chief Exec. Officers (April 13, 2021) (defining as "suitable for home confinement" BOP residents who are "Low or Minimum security" and "Low or Minimum PATTERN recidivism risk score[s]").

The BOP Director likewise "characterize[ed]" PS 5100.08 as mandatory, *Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 63 (D.C. Cir. 2020), commanding that all security designation decisions "will be made in accordance with * * * this Program Statement and are effective immediately," PS 5100.08 at 5.  Program Statement 5100.08's criminal history scoring rule states in no uncertain terms that for "D.C. Code offenders * * * the Criminal History Score <u>will be</u>

derived * * * according to the following procedures." PS 5100.08 at 33 (emphasis added). The use of "mandatory language" — such as "will be derived" — "eliminate[s] agency discretion" and is an indication that the rule is binding and "determinative of issues and rights[.]" *Fed. L. Enf't Officers Ass'n v. Rigas*, 2020 WL 4903843, at *5 (D.D.C. Aug. 20, 2020). The BOP itself treats the scoring guidelines as binding and conclusive as they referred Plaintiff Blades to Program Statement 5100.08, *see* Ex. D, Declaration of Jonathan Blades ("Blades Decl.") & Supporting Documents at 6, when he challenged his own discriminatory criminal history scoring. *See Whitman*, 531 U.S. at 479 (noting that the agency's "own behavior" supported that the challenged action was final agency action). Furthermore, BOP staff have relied on and applied the rule to score thousands of individuals' criminal history points over the past 15 years.

In sum, Program Statement 5100.08's criminal history scoring rule is final agency action because it reflects the agency's settled position, is binding with no room for discretion in how it is applied to individuals with D.C. Code convictions, and significantly affects individuals' rights and privileges with respect to housing, programming, and home confinement opportunities.

> 2. *BOP rules are presumed to be reviewable by courts and 18 U.S.C. § 3625 does not preclude a systemic challenge like the one raised by Plaintiffs.*

There is a well-established presumption "favoring judicial review of administrative action." *In re Fed. Bureau of Prisons' Execution Protocol Cases* ("*In re FBOP*"), 980 F.3d 123, 137 (D.C. Cir. 2020) (quoting *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020)). As a preliminary matter, "the Bureau of Prisons is part of the Department of Justice, and thus undeniably an 'agency'" governed by the APA. *White v. Henman*, 977 F.2d 292, 293 (7th Cir. 1992); *see also*

*Ramer v. Saxbe*, 522 F.2d 695, 697 (D.C. Cir. 1975).[11]  When appearing before the Supreme Court, the BOP has stated the same — that it is obligated to "interpret [authorizing] statute[s] reasonably" and "in a manner that is not arbitrary or capricious" under 5 U.S.C. § 706(2)(A).  *Lopez v. Davis*, 531 U.S. 230, 240 (2001) (discussing BOP's published rules regarding early release criteria). Applying the APA's scope of review to BOP final actions, the D.C. Circuit recently examined its execution protocol and held it unlawful for violating a federal statute governing the use of prescription drugs.  *See In re FBOP*, 980 F.3d at 137.  District courts have likewise reviewed BOP program statements to ensure they comply with the APA's prohibition on arbitrary agency action. *See, e.g.*, *Jordan v. Fed. Bureau of Prisons*, No. 20-CV-1478, 2021 WL 4148549, at *11–12 (D.D.C. Sept. 13, 2021) (reviewing Program Statement 5270.09 to determine if disciplinary fine caps established by the BOP were arbitrary and capricious).

Final agency actions are reviewable under the APA unless a statute specifically "preclude[s] judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).  Given the presumption favoring APA review, Congress' intention to preclude judicial review must be supported by "clear and convincing evidence."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).  Where, as here, the plaintiff raises a constitutional claim under the APA, this Court requires a "heightened showing [of unreviewability] in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial

---

[11] Accordingly, the APA waives sovereign immunity of the United States for claims seeking injunctive relief against a federal agency.  *See Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) (en banc).  The D.C. Circuit has further held that section 702's waiver of sovereign immunity "applies to any suit whether under the APA or not."  *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005).

forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (quoting *Bowen v. Mich. Acad. of Family Phys.*, 476 U.S. 667, 681 n.12 (1986)).

Under either the *Abbott Laboratories* or the *Webster* standard, Plaintiffs' claims are reviewable in this Court.  While 18 U.S.C. § 3625 excludes "any [BOP] determination, decision, or order" regarding an individual's place of imprisonment from APA review, it leaves open certain types of APA challenges — specifically, challenges to wide-sweeping rules or practices that were used or relied on in reaching individual determinations.

In this case, Plaintiffs are not challenging individualized determinations regarding facility placements or security designations.  *See Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017) (individual housing and security determinations are exempt from APA review). Instead, Plaintiffs are challenging the systemic application of an unfair criminal history scoring rule.  As Circuit and District courts have noted, "[a] prisoner may challenge, though, the policy used to make [an otherwise unreviewable] determination." *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 86 (D.D.C. 2006) (citing *Wiggins v. Wise*, 951 F. Supp. 614, 618–19 (S.D.W.Va. 1996); *Lyle v. Sivley*, 805 F. Supp 755, 758–59 (D. Ariz. 1992)); *Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998) ("[I]t is apparent that § 3625 precludes judicial review of agency adjudicative decisions but not of rulemaking decisions."); *Johnston v. Thomas*, No. 09-CV-1096, 2010 WL 2574090, at *5 (D. Or. June 24, 2010) ("Congress intended that BOP rulemaking be reviewable under the APA"); *Pullie v. Stansberry*, No. 08-CV-442, 2009 WL 2176120, at *4 (E.D. Va. July 15, 2009) (finding that the BOP's categorical exclusion of inmates from early release was not a "determination" under 18 U.S.C. § 3625 and was reviewable under the APA); *Jones v. Zenk*, 495 F. Supp. 2d 1289, 1300 (N.D. Ga. 2007) (collecting cases where courts reviewed rules promulgated by the BOP affecting individual facility placements); *Mack v.*

*Eichenlaub*, No. 05-CV-1849961, 2009 WL 1849961, at *4 n.3 (N.D. Fla. June 26, 2009), report

and recommendation adopted 2009 WL 2365706 (noting that BOP conceded that challenges to its

rulemaking are permitted under 18 U.S.C. § 3625).

The "structure and legislative history of [18 U.S.C. § 3625]" support and reinforce that

distinction.  *Jasperson*, 460 F. Supp. 2d at 84.  First, 18 U.S.C. § 3625 explicitly excludes

individual "decision[s], determination[s], or order[s]" from APA review but not the *rules*

"inform[ing]" how those determinations are made.  *Id.* at 84.  Section 3625 establishes that BOP

determinations need not comply with 5 U.S.C. § 554's (required procedures for adjudications) and

§ 555's (providing that a party compelled to appear before an agency must be allowed a

representative) requirements.  It makes no reference, however, to 5 U.S.C. § 553, the requirements

imposed on agencies when promulgating rules.  *See Wiggins*, 951 F. Supp. at 618.  By listing out

the types of action that were precluded from review (decisions, determinations, and orders) and

the statutes with which the BOP need not comply (§ 554 and § 555), Congress demonstrated that

it understood how to exempt agency actions from APA review when it wanted to do so.  Tellingly,

Congress did not list rules as one of the BOP actions exempt from review because it intended for

rules to be reviewable under the APA.  Put differently, 18 U.S.C. § 3625 does *not* excuse the BOP

from complying with the APA when it comes to rules and rulemaking, which are at issue here.

Section 3625's legislative history further corroborates that Congress wanted to provide the

BOP discretion in making individualized decisions regarding prison placement while still

authorizing judicial review of "generally applicable regulations." H.R. Report No. 98-1030, 98th

Cong. 2d Sess. 149 (1984) *reprinted in* 1984 U.S.C.C.A.N. 3182, 3332.  The House report defines

§ 3625's "any determination, decision, or order" as the "adjudication of specific cases" and not

widely applied rules.  *Id.*; *see also Lyle*, 805 F. Supp. at 759 (holding "rule-making activities are

to be reviewed under the APA, while adjudication[s] of specific cases are not." (internal quotation

omitted)).  As written and applied, § 3625 does not permit the BOP to evade APA review when it

creates and applies rules affecting security designations in an arbitrary and discriminatory manner.

P5100.08's criminal history scoring rule is thus reviewable under the APA and fails to satisfy the

APA's reasonability requirement for all of the reasons outlined above.

> **b.**  *The Bureau of Prisons violated the Administrative Procedure Act by promulgating the substantive criminal history scoring rule without notice and comment.*

On top of violating the APA's substantive requirements, the BOP also violated the APA's

procedural requirements by implementing its criminal history scoring rule for individuals with

D.C. Code convictions without notice and comment.  Under the APA, the BOP must provide notice

and an opportunity to comment before promulgating a rule.  5 U.S.C. § 553(b)-(c).  Specifically,

the BOP must "publish[ ] in the Federal Register" a "general notice of proposed rule making" with

the "terms or substance of the proposed rule or a description of the subjects and issues involved."

*Id*. § 553(b).  After notice is provided, the BOP is required to "give interested persons an

opportunity to participate in the rule making through submission of written data, views, or

arguments[.]"  *Id.* § 553(c).

In September 2006, the Bureau published its Security Designation and Custody

Classification Program Statement (P5100.08) — which includes the criminal history scoring

rule — without any prior notice or opportunity for comment, a clear violation of the APA,

requiring the rule be vacated.  *See Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 108 (D.C.

Cir. 2021) (holding that Department of State's guidance must be vacated because it was issued

without notice and comment).  The Federal Register contains no notice of the "terms or substance"

of the criminal history scoring rule nor is there any indication that the BOP solicited comments

from interested parties, including the incarcerated individuals that were subject to it. *See Royer v. Fed. Bureau of Prisons*, 934 F. Supp. 2d 92, 101 (D.D.C. 2013) ("The prisoners directly affected by a regulation are clearly 'interested persons.'"). The BOP's failure to provide notice and an opportunity to comment is undeniable; thus, the only question is whether the criminal history scoring rule is a "legislative rule" because legislative rules require notice and comment while interpretive rules do not. *Nat'l Council for Adoption*, 4 F.4th at 114.

Legislative rules are ones that "ha[ve] legal effect" or where the agency intends to exercise its "delegated legislative power by speaking with the force of law" whereas interpretive rules "are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Nat'l Council for Adoption*, 4 F.4th at 114 (quoting *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) and *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015)). In simplest terms, legislative rules "creat[e] legal effects" and interpretive rules simply explain "*preexisting* legal rights." *Nat'l Council for Adoption*, 955 F.3d at 83 (emphasis in original) (quoting *Nat. Res. Def. Council*, 955 F.3d at 83). Specifically, an interpretive rule is grounded in an "existing document, such as a statute, regulation, or judicial decision, whose meaning compels or logically justifies the proposition." *Nat'l Res. Def. Council*, 955 F.3d at 114.

The criminal history scoring rule is a legislative rule because it creates an entirely new scheme for scoring individuals; one that "speak[s] with the force of law" because it has a determinative effect on an individual's security classification and PATTERN score. *Nat. Res. Def. Council*, 955 F.3d at 83 (cleaned up). Section 3621 broadly and amorphously requires the BOP to "designate the place of the prisoner's imprisonment * * * subject to * * * the prisoner's security designation," among other factors. 18 U.S.C. § 3621. Congress gave the BOP "a general statutory mandate," and the BOP "exercise[d] its judgment," *Am. Min. Cong. v. Mine Safety & Health*

*Admin.*, 995 F.2d 1106, 1110 (D.C. Cir. 1993) (quoting *United Techs. Corp. v. EPA*, 821 F.2d 714, 719–20 (D.C. Cir. 1987)), by creating a specific scheme for scoring the criminal history of individuals with D.C. Code convictions — a key component of their security classification, which determines the conditions of their imprisonment.

What is more, the BOP's rule was a significant departure from the U.S. Sentencing Commission's established criminal history scoring system.  The BOP, therefore, chose to wield its own statutorily authorized power to determine how criminal history points should be scored for individuals with D.C. Code convictions.  Deciding to substitute the BOP's own judgment for that of the more experienced U.S. Sentencing Commission was a "quintessentially legislative" action, "manifesting [the BOP's] intent to exercise its delegated legislative power and speak with the force of law."  *Nat. Res. Def. Council*, 955 F.3d at 83; *see* PS 5100.08 at 1 ("The Bureau's classification, designation and redesignation procedures are consistent with the statutory authority contained in 18 U.S.C. § 3621(b)").

No statute or regulation authorized the BOP to treat individuals with D.C. Code convictions differently than federal prisoners for purpose of security designations.  Indeed, the opposite is true.  The BOP's criminal history scoring rule expressly violates the law requiring that individuals with D.C. Code convictions "be subject to any law or regulation applicable" to individuals with federal convictions, D.C. Code § 24-101.  The BOP's program statement also "created legal effects" on individuals with D.C. sentences for the first time without authorization.  Prior to its criminal history scoring rule, the BOP "had never before announced a categorical [difference]" on how individuals with D.C. Code convictions would have their criminal histories scored.  *Nat'l Council for Adoption*, 4 F.4th at 114.  The BOP was not simply explaining pre-existing legal rights in Program Statement 5100.08; instead, it created significant and distinct legal interests in individuals with

28

federal convictions and individuals with D.C. Code convictions by creating different substantive outcomes regarding their security classification and PATTERN scores.  Nor could it be "logically justified" by the Revitalization Act, given that the statute intended to put individuals with D.C. Code convictions on equal footing with their federal counterparts.

The fact that the BOP implemented its rule through a "Program Statement" does not alter the analysis.  *See Nat. Res. Def. Council*, 955 F.3d at 85 ("[W]e have found cases 'in which a government agency seeks to promulgate a rule by another name — evading altogether the notice and comment requirements' — to be the 'most egregious' breaches of notice-and-comment obligations." (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014)).  In *National Council*, for instance, the D.C. Circuit held that "guidance" put up by the State Department on its Frequently Asked Questions webpage was a legislative rule because it prohibited adoption agencies from making certain types of adoption referrals at the risk of suffering legal consequences.  *See* 4 F.4th at 109, 114.  Similar to *National Council*'s FAQ guidance, Program Statement 5100.08's criminal history scoring rule put a class of individuals at risk of suffering consequences — more severe security placements and decreased eligibility for home confinement — without clear statutory or regulatory authorization.[12]

As a practical matter, requiring the BOP to provide advance notice of its intent to alter the criminal history scoring scheme for individuals with D.C. Code convictions and give individuals

---

[12] The times when courts have found BOP program statements to be interpretive rules were when the program statement offered "the most natural[,] reasonable" and consistent reading of a statutory or regulatory term. *Reno v. Koray*, 515 U.S. 50, 61 (1995) (program statement defining "official detention" within context of 18 U.S.C. § 3585); *Pelissero v. Thompson*, 170 F.3d 442, 444 (4th Cir. 1999) (a program statement providing a list of offenses the BOP considered to be "crimes of violence," a term defined in 28 C.F.R. § 550.58 and 18 U.S.C. § 924(c)(3)); *Jordan*, 2021 WL 4148549, at *9 (finding a program statement that sets monetary guidelines on sanctions to be interpretive because a statute and regulation already established that prisoners could be subject to monetary fines for disciplinary infractions and the guidelines were discretionary).

subject to the scheme, as well as key stakeholders like the D.C. Corrections Information Council,[13]

legislators, city officials, and supporting agencies, the opportunity to comment is not overly

burdensome.  The BOP has conducted rule making with the necessary notice-and-comment period

when issuing similar types of guidance.  The BOP, for example, went through notice-and-comment

rulemaking when creating Communications Management Units, *see Aref v. Holder*, 774 F. Supp.

2d 147, 171 (D.D.C. 2011) (setting a 2-month comment period), and with regards to transfers to

reentry centers, *Jones*, 495 F. Supp. 2d at 1301 ("BOP proposed and adopted new regulations

pursuant to the notice and comment procedures" regarding when individuals could transfer to

Residential Reentry Centers).  In fact, after notice-and-comment, the BOP published a full set of

regulations regarding the Communications Management Units, and then issued a program

statement to explain the terms of those regulations.  *See* U.S. DEP'T OF JUSTICE, FED. BUREAU OF

PRISONS, PROGRAM STATEMENT 5214.02: COMMUNICATIONS MANAGEMENT UNITS (2015).  Those

regulations — like the program statement at issue here — subject certain individuals to higher

levels of supervision and rigorous restrictions and demonstrate that the BOP is capable of going

through the formal rulemaking process expeditiously, receiving comments, and considering those

comments in establishing regulatory guidelines without undue delay.

> **2. Plaintiffs are substantially likely to succeed on the merits of their claim that the Bureau of Prisons violated the Fifth Amendment's guarantee of fair and equal treatment.**

The Equal Protection Clause requires Federal agencies "to treat similarly situated persons

alike." *Women Prisoners of D.C. Dep't of Corr. v. D.C.*, 93 F.3d 910, 924 (D.C. Cir. 1996) (citing

---

[13] The District of Columbia Corrections Information Council (CIC) was specifically created by the U.S. Congress and the D.C. Council as an independent monitoring body to investigate the treatment of individuals with D.C. Code convictions in federal prisons.  *See* D.C. Code § 24-101.01.

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)) (the Fourteenth Amendment's equal protection clause is incorporated into the Fifth Amendment's guarantee of due process of law).  When, as here, agency rules do not treat similarly situated persons alike, "'equal protection requires that a classification between similarly situated individuals bear some rational relationship to a legitimate [governmental] purpose.'" *Harrison v. Fed. Bureau of Prisons*, 298 F. Supp. 3d 174, 181 (D.D.C. 2018) (quoting *Brandon v. D.C. Bd. of Parole*, 734 F.2d 56, 60 (D.C. Cir. 1984)).

To start, individuals with federal convictions and individuals with D.C. Code convictions are "similarly situated."  The populations of individuals with D.C. and Federal sentences are alike in that they are composed of a wide array of ages, types of convictions, and sentence lengths.[14] All of the individuals in BOP custody — regardless of where they were sentenced — undergo a similar intake procedure:  their security score is calculated within weeks of entering BOP custody and they are designated to the same list of prisons based on those security scores, which are reviewed and updated annually.  The security score for both the federal and D.C. populations includes the exact same factors — type and severity of the instant offense, history of violence, history of escapes, presence of detainers, age, education level, substance abuse, and criminal history scores.  According to the BOP, "[t]he classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society."  PS 5100.08 at 1.  The BOP aims to provide "an <u>objective</u> and <u>consistent</u> system of classification."  *Id.* (emphases added).

---

[14]    *See* Fed. Bureau of Prisons, *Statistics*, https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp (last accessed Feb. 3, 2022) (showing the breakdown of individuals in BOP custody across age, gender, offenses, security levels and sentences).

As previously discussed, there is only one significant difference between the two populations — individuals with federal convictions are majority White whereas the overwhelming majority of individuals with D.C. Code convictions are Black.  *Compare* BUREAU OF PRISONS, *Inmate Race*, https://www.bop.gov/about/statistics/statistics_inmate_race.jsp (last accessed Feb. 3, 2022) (57.9 percent of the BOP population is White and 38.1 percent is Black) *with* COUNCIL FOR COURT EXCELLENCE, BOP DATA SNAPSHOT 2 (95.6. percent of people serving D.C. Code sentences are Black).  To the extent the BOP relies on a racial classification to distinguish the two populations, the BOP's discriminatory rule must be subject to strict scrutiny, the most demanding and rigorous judicial review.  *See Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 280 (1986).

Indeed, greater scrutiny is warranted here because the BOP keeps careful data on residents' race, *see,* BUREAU OF PRISONS, *Inmate Race*, https://www.bop.gov/about/statistics/statistics_inmate_race.jsp (last accessed Feb. 3, 2022), and in fact takes explicit consideration of race in monitoring prison populations, *see* Brief for the United States at 25, *Johnson v. California*, 543 U.S. 499 (2005) ("BOP monitors the racial composition of its institutions and may consider race in overseeing the population of an institution * * * .").  The BOP has also promulgated a regulation mandating that it "shall not discriminate against inmates on the basis of race * * * includ[ing] the making of administrative decisions and providing access to work, housing and programs."  28 C.F.R. 551.90.  Therefore, not only is the BOP aware of the racial impact that its criminal history scoring rule engenders but it also is in violation of its own regulation which expressly prohibits racial discrimination in housing decisions.  At the very least, the BOP's scoring rule's disproportionate and significant racial impact on housing decisions is additional evidence that it lacks a rational basis.

In cases where agency actions are challenged, courts have found the equal-protection challenge to be "subsumed" within the APA analysis — answering the question "whether the * * * treatment of [Plaintiff] was rational (i.e., not arbitrary and capricious)." *Cooper Hosp./Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 47 (D.D.C. 2016), *aff'd sub nom. Cooper Hosp. Univ. Med. Ctr. v. Price*, 688 F. App'x 11 (D.C. Cir. 2017) (quoting *Ursack, Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 955 (9th Cir. 2011); *see also United States v. Weston*, 255 F.3d 873, 880 (D.C. Cir. 2001) (noting that the "arbitrary and capricious' and "rational basis" tests are "analogues").  The D.C. Circuit has likewise considered "[APA and Equal Protection] arguments together" and will vacate an agency action "if 'the agency offers insufficient reasons for treating similar situations differently.'" *Grant Med. Ctr. v. Hargan*, 875 F.3d 701, 708 (D.C. Cir. 2017) (quoting *Muwekma Ohlone Tribe*, 708 F.3d at 215).  In other words, the Director of the Bureau of Prisons must be able to provide "a satisfactory, rational explanation for [its] actions here." *Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 747 F.3d 172, 180 (3d Cir. 2014).[15] It cannot.  There is no rational basis for distinguishing between the similarly situated federal incarcerated population and D.C. incarcerated population with regards to their criminal history calculations, and the BOP's arbitrary classification fails to pass muster under the Fifth Amendment.

---

[15] When, as here, an agency rule or regulation — and not a Congressional statute — is the cause of the unequal treatment, the equal protection analysis differs in that the burden is on the agency to explain why the differing treatment is rational.  "When the disparate treatment is the result of congressional action, however, both the burden and the permissible kinds of argument shift in favor of the government." *Cooper Hosp.*, 179 F. Supp. 3d at 47 (emphasis in original).  A statute that has passed through the deliberative bicameral legislative process "bear[s] a strong presumption of validity," *id.*, that a unilaterally imposed agency action — like Program Statement 5100.08 — does not.

As previously discussed, there is no record of consideration — containing data, evidence, and reasoning — supporting the BOP's decision to treat the two populations differently. *See supra* Sec. A.1.a. Nor is there any rational basis for treating the two populations differently. It is indisputable that for individuals with both D.C. Code and federal convictions, it is in the BOP's best interest to have the most accurate criminal history score possible because that score helps define an individual's security and programming needs, which are at the core of the BOP's mission, and their risk of recidivism. The BOP can also not argue that its rudimentary scoring system equates with or is superior to the "empirically validated" scoring system set forth in the Sentencing Guidelines. Finally, the BOP cannot rely on administrative convenience as a rational basis for operating two different scoring systems because BOP staff are clearly capable of learning the Sentencing Guidelines' definitions and exceptions and many of them are already familiar with them. *See* Reply to Government's Opposition to Motion for Compassionate Release at 5, *United States v. Larry Finch*, Case No. 2002 FEL 8241 (Christian, J.) (D.C. Super. Ct.) (upon defendant's challenge, BOP staff applied the Sentencing Guidelines' criminal history scoring rule to his prior convictions, which resulted in a "Low" PATTERN score). Moreover, BOP staff are already required to do individualized reviews of criminal history documentation and Presentence Reports to tally an individual's criminal history score and annually update it, so internal processes are hardly affected by implementing the Sentencing Guidelines' rule for all individuals in BOP custody.

The BOP has further explained that its legitimate governmental purpose requires that the system of classification be "objective" and "consistent," PS 5100.08 at 1 (discussing the program "objectives"), but the outlined differences in how individuals with D.C. Code convictions and federal convictions are scored significantly undermines that purpose and any uniformity the BOP

purports to achieve, especially given the rule's disproportionate racial impact.[16]   All of the evidence supporting that the BOP's criminal history scoring rule is arbitrary and capricious, *see supra* Sec. A.1., applies with equal force to the Fifth Amendment analysis.   At bottom, the BOP's "conclusory" and "unsupported" rule puts individuals with D.C. Code convictions at a significant disadvantage to their federal counterparts and denies them equal treatment under the law.

### B. Plaintiffs suffer irreparable harm from the challenged policy.

Without a preliminary injunction, Plaintiffs and proposed class members will suffer irreparable harms.   In this Circuit, "a prospective violation of a constitutional right constitutes irreparable injury."   *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (citing *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987)).   Because Plaintiffs are substantially likely to succeed on the merits of their Equal Protection Clause claim, they necessarily meet this factor. Plaintiffs and proposed class members separately meet this factor on their APA claim because the relief requested could help "secure the plaintiff's freedom or could alleviate harsh conditions of confinement" — harms that cannot be remedied by money damages and are therefore irreparable. *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018).   In addition, PATTERN scores help determine programming needs and Plaintiffs are currently deprived of an accurate assessment of their programming needs due to inaccurate PATTERN scores.

First, Plaintiffs' Fifth Amendment equal protection injury constitutes irreparable injury.   "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"   *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

---

[16] As further evidence of the lack of rationality, the BOP is prohibited from favoritism in "classification [and] designation" decisions, PS 5100.08 at 1, but the criminal history scoring rule implicitly allows them to favor individuals with federal sentences.

Where, as here, a plaintiff is likely to succeed on the merits of its "constitutional equal protection claim * * * this deprivation of Plaintiff's constitutional rights constitutes irreparable harm." *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012).

Here, Plaintiffs suffer unlawful discrimination on the basis of the court from which they were convicted — discrimination that injures Plaintiffs. As Plaintiff Blades writes, "When I found out that I was being treated and scored differently than individuals with federal convictions, I was upset. I am suffering because I am treated unfairly and it is harder for me to get opportunities that other people just like me are getting." Ex. D, Blades Decl. ¶ 4. Plaintiff Blades' stigmatization is borne out by other evidence demonstrating that BOP residents who are sentenced in D.C. Superior Court face greater stigmatization from staff and other residents. *See, e.g.*, D.C. CORRS. INFO. COUNCIL, FCI MCDOWELL INSPECTION REPORT 2 (2019) (noting that "DC inmates reported discriminatory treatment by staff, including being called 'DC Blacks' * * * by staff, and told that they cause too much trouble and do not know how to obey orders"). The BOP's discriminatory policy contributes to this stigmatization because it results in the disproportionate classification of people with D.C. convictions in higher security prisons, leading BOP staff and residents alike to perceive people with D.C. code offenses as being dangerous and violent.

Plaintiffs suffer a separate irreparable harm in the form of the violation of their equal protection rights. This Circuit has recognized that an equal protection violation like the one suffered by Plaintiffs is a per se irreparable harm. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[A] prospective violation of a constitutional right constitutes irreparable injury for these purposes."); *Mills*, 571 F.3d at 1312.

Second, and separately, Plaintiffs suffer injury because relief here "could alleviate harsh conditions of confinement," which are harms that "surely cannot be remediated after the fact."

*Aracely, R.*, 319 F. Supp. 3d at 155.  Plaintiffs are subject to higher rates of violence in higher security facilities, fewer programming opportunities, greater restrictions on liberty, lower pay for work duty jobs, and fewer opportunities to practice their religion.  *See generally* Ex. D, Blades Decl.; Ex. C, Declaration of Antwan Buchanan ("Buchanan Decl.").  These restrictions amount to irreparable harm.  *See, e.g.*, *Tanner v. Fed. Bureau of Prisons*, 433 F. Supp. 2d 117, 125–26 (D.D.C. 2006) (finding a plaintiff was irreparably harmed when transferred from a medium to a high security BOP facility based on the diminished pay grade and "loss of access" to a job training program).

Plaintiffs are irreparably harmed by the challenged policy because the policy is a significant contributor to their incarceration in more restrictive facilities.  As the BOP itself describes, the differences between security levels is significant, implicating "perimeter barriers," "internal security," "type of inmate housing," and "inmate-to-staff ratio."  *See* PS 5100.08 at 7.

The named Plaintiffs are subject to those differences each and every day.  For instance, Mr. Blades is unable "to take part in college courses" that he attended while at a medium facility but "are not offered at USPs."  Ex. D, Blades Decl. ¶ 16(a).  Plaintiffs also experience significantly fewer liberties at high security facilities where they are confined to their cells for most of the day, unable to use the phone, to go outside, or to participate in programming.  *See id.* ¶ 16(b); *see also* Ex. C, Buchanan Decl. ¶¶ 19–21.  Mr. Buchanan, for instance, has tried to enroll in "forklift operation courses," but they are not available at his high security facility, while they are available at medium security facilities.  Ex. C, Buchanan Decl. ¶ 21.  High security facilities are also more dangerous than medium and low security facilities, as Mr. Blades explains that "[t]here is more gang violence" and a "much greater likelihood that fights can escalate" at high security facilities.  Ex. D, Blades Decl. ¶ 16(c).  Empirical evidence confirms Plaintiffs' own experiences.  The BOP's own data shows that high security facilities account for more than half of all violent incidents that take place in the BOP,

despite housing around 12 percent of residents.  *See* Ex. B, Winshall Decl. ¶ 7.  Plaintiffs also make

less money during their required work duty jobs, because "[t]he payment for * * * work duty jobs is

lower [at a high security facility] than at medium facilities."  Ex. C, Buchanan Decl. ¶ 22.

Moreover, Plaintiffs are irreparably harmed because BOP's unlawful practice precludes their

consideration for home confinement.  Under guidance from the BOP, only residents who are "Low

or Minimum security" and who have "a Low or Minimum PATTERN recidivism risk score" — two

designations that rely heavily on a resident's criminal history score — are to be considered "suitable

for home confinement."  Memorandum from Andre Matevousian, Ass't Dir., Corr. Programs Div.,

Bureau of Prisons, to Chief Exec. Officers (April 13, 2021).  Plaintiffs "would like to be considered

for home confinement" but are unable to do so because they reside in a high security facility.  Ex. C,

Buchanan Decl. ¶ 18; Ex. D, Blades Decl. ¶ 14.  Plaintiffs therefore continue to suffer a "loss of

liberty" as a result of the BOP's policy that is a quintessential form of irreparable harm.  *Jimenez v.*

*Cronen*, 317 F. Supp. 3d 626, 657 (D. Mass. 2018); *see also Matacua v. Frank*, 308 F. Supp. 3d 1019,

1025 (D. Minn. 2018) ("loss of liberty — which is perhaps is the best example of irreparable harm").

### C.  The balance of the equities and the public interest support an injunction.

Plaintiffs suffer significant harms because of the BOP's unconstitutional and unlawful rule.

Plaintiffs and the proposed class of thousands of people serving D.C. Code offenses are stigmatized

by the discriminatory harsher treatment of their criminal histories.  For one, Plaintiffs are dramatically

and disproportionately housed in high security facilities — more than three times as likely to be

incarcerated in a high security penitentiary than other BOP residents.  As a result, Plaintiffs are

exposed to significant physical and sexual violence, enjoy fewer liberties, make less money at their

prison jobs, and have fewer opportunities for rehabilitative, vocational, and religious

programming.  *See* Ex. B, Winshall Decl. ¶ 7; Ex. D, Blades Decl. ¶ 16; Ex. C, Buchanan Decl. ¶¶

19–21.  Plaintiffs are also disproportionately denied the opportunity to be considered for home confinement, extending their term of incarceration in prison.  *See* Memorandum from Andre Matevousian, Ass't Dir., Corr. Programs Div., Bureau of Prisons, to Chief Exec. Officers (April 13, 2021).

In contrast to the harms that Plaintiffs and the proposed class will suffer if the BOP continues to implement its discriminatory policy, the BOP will not be harmed by an injunction.  The BOP has no legitimate interest in breaking the law.  "The Government 'cannot suffer harm from an injunction that merely ends an unlawful practice,'" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)), and the "public interest is served when administrative agencies comply with their obligations under the APA," *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (citing *New Jersey v. Env't Prot. Agency*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)).  Enjoining the BOP's unlawful policy will be in the public interest, because "enforcement of an unconstitutional law is always contrary to the public interest."  *Gordon*, 721 F.3d at 653.  Enjoining the BOP's policy will also more accurately reflect the criminal history scores of BOP residents and more accurately predict recidivism risk, because the Sentencing Guidelines' Criminal History Score is empirically validated, while the BOP's rule is not.

Moreover, the BOP cannot complain that it is unable to rescore Plaintiffs' criminal history scores, because the BOP has already done so in individual cases.  For instance, in *United States v. Larry Finch*, Case No. 2002 FEL 8241 (Christian, J.) (D.C. Super. Ct.), defense counsel complained that the defendant's criminal history score would have been significantly lower if it had been accurately calculated under the Sentencing Guidelines and not the BOP's rule.  The BOP agreed to recalculate the defendant's criminal history score under the guidelines, which resulted in lowering his PATTERN recidivism risk score from "High" to "Low."  The BOP has experience recalculating

Plaintiffs' and proposed class members' criminal history scores.  Rather than responding piecemeal to individual requests for rescoring, the BOP's systemic discrimination demands a systemic, class-wide solution.

## **<u>CONCLUSION</u>**

For the reasons explained above, Plaintiffs respectfully request that this Court issue a preliminary injunction requiring the BOP to stop quantifying the criminal history of individuals with D.C. Code convictions based on a discriminatory scoring rule.  Plaintiffs also respectfully request that this Court set a date for a hearing, pursuant to Local Rule 65.1(d).


Dated: February 3, 2022

Respectfully submitted,


<u>/s/ Kavya Naini</u>
Kavya R. Naini
D.D.C. Bar No. D00490
Zoé E. Friedland
D.D.C. Bar No. D00516

Public Defender Service
633 Indiana Ave. N.W.
Washington D.C., 20004
(202) 824-2529
knaini@pdsdc.org
